UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

GERALD OSCAR, Individually and on Behalf of
All Others Similarly Situated,

                                    Plaintiff,


                    - against -


BMW OF NORTH AMERICA, LLC,

                                    Defendant.

09 Civ. 11 (RJH)


<u>**MEMORANDUM OPINION AND
ORDER**</u>

Richard J. Holwell, District Judge:

Gerarld Oscar ("Oscar") brings this putative class action against BMW of North America, LLC ("BMW") alleging that the Goodyear run-flat tires ("RFTs") with which his 2006 MINI Cooper S was equipped were defective.  He brings suit under New York law for breach of contract, breach of express warranty, breach of implied warranty, deceptive business practices under N.Y. Gen. Bus. Law § 349, and false advertising under N.Y. Gen. Bus. Law § 350.  He also brings suit under the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301 *et seq.*, for breach of implied warranty.  Oscar moved for class certification on August 30, 2010.  He proposes to certify a nationwide class and a New York sub-class of consumers who bought or leased a MINI with Goodyear RFTs between 2005 and 2009.  On January 31, 2011, the Court

heard oral argument on this matter.  For the reasons set forth below, Oscar's motion for class certification is DENIED.

## FACTUAL BACKGROUND

Oscar purchased his new 2006 MINI Cooper S from BMW/MINI of Manhattan, an authorized MINI dealership, on January 5, 2006.  (Pl.'s Ex. 2.)  Prior to purchasing the MINI, Oscar did not do any sort of research (Oscar Dep. 36), nor did he take the car for a test drive (*id*. 38).  Oscar did notice a $600 charge listed on the window sticker for RFTs.  (*Id*. 45-46.)  He asked the salesperson what the charge was for, and she informed him that it was for RFTs, an innovation that allowed drivers to drive to the nearest service station even after the tire was flat. (*Id*. 46.)  As of December 2, 2009, a period of about three years, Oscar had had five flat tires. (*Id*. 25.)  Oscar has provided service records for one of these incidents indicating that the cost, including labor, to replace the tire was approximately $400.  (Pl.'s Ex. 3.)

Oscar believes that his troubles stemmed in large part from the fact that his car was equipped with RFTs rather than with standard radial tires.  Whereas Oscar paid $400 on one occasion to replace an RFT, radial tires can cost approximately $100 each.  (Pl.'s Ex. 10.)  Oscar has also found the RFTs to be difficult to come by, meaning that replacing an RFT is inconvenient.  (Oscar Dep. 25.)  He was also disappointed to find that although the car was equipped with a jack, the car did not come with a spare tire.  (*Id*. 24.)  He also considers the number of flat tires he experienced to be evidence of a widespread defect.

No one alerted Oscar to these alleged defects before he purchased the car.  For example, a 2005 MINI advertisement describes the RFTs as follows:

RUN FLAT TECHNOLOGY:  With available run-flat tires (1) you can drive up to 80 miles at 50 mph on a "flat" tire.  The flat tire monitor (2) alerts the driver the moment a tire's revolution rate changes, indicating that tire integrity has been compromised.

2

(Pl.'s Ex. 12.)  The advertisement does not disclose that RFTs are allegedly less durable than standard tires.  MINI also has a policy that Oscar characterizes as a prohibition against repairing MINI RFTs.  This advice can be found in the owner's manual and reads:  "For safety reasons, the manufacturer of your MINI recommends having Run Flat tires replaced, not repaired if they are damaged."  (Pl.'s Ex. 10.)

Several journalists have described the fragility of RFTs.  A *Wall Street Journal* article reported that "[m]ost run-flats are really high-performance tires and as such have higher prices and shorter tread life than typical mass-market tires."  Jonathan Welsch, *Puncturing the $200 Tire—Drivers Fault Cost, Durability of Tires that Don't Go Flat; Factoring in the Safety Issue*, WALL ST. J., July 24, 2007, at D1.  Oscar has also produced a *Road & Track* customer survey that revealed that MINI drivers complained that MINI's tires needed frequent replacement and were expensive.  Peter Bohr, *Owner Survey:  2002-2005 Mini Cooper & Cooper S:  Odes of Joy Mask Loads of Woe*, ROAD & TRACK, February 2006, *available at* http://www.roadandtrack.com/tests/long-tests/owner-survey-2002-2005-mini-cooper-cooper-s. The article surveyed owners who purchased MINIs of model years 2002-2005, but was weighted toward earlier years, whereas the class period runs from 2005-2009.  *Id.*  J.D. Power and Associates also surveyed MINI owners and found that, based on an undefined "small sample," a substantial number experienced tire punctures within two years of purchase over the class period. These numbers ranged from a low of 11.3% to 41.2% of vehicle owners depending on the year.[1] (Pl.'s Ex. 15.)  None of these sources document whether Goodyear RFTs specifically suffered

---

[1] One year of data provided the number of punctures within twenty-two months as opposed to two years.

from these defects.  According to a Goodyear press release, 80% of MINIs imported to the US were equipped with either Goodyear or Dunlop tires in 2002.[2]  (Pl.'s Ex. 20.)

## PROCEDURAL BACKGROUND

Oscar filed this suit on January 5, 2009 against BMW and Goodyear Tire & Rubber Company, Inc. ("Goodyear").  On June 5, 2009, BMW moved to dismiss certain counts of Oscar's complaint, and Goodyear moved to dismiss the complaint against Goodyear in its entirety.  Ruling from the bench on March 15, 2010, the Court granted Goodyear's motion to dismiss and denied BMW's.  One of the arguments that both Goodyear and BMW raised was that Oscar did not properly allege privity of contract, which is necessary for a New York breach of implied warranty claim.  The Court held that Oscar had not properly pleaded privity with Goodyear, but had properly pleaded privity with BMW by alleging that the MINI dealer from which Oscar purchased his car was acting as BMW's agent.  (Motion to Dismiss Hr'g Tr. 34: 11-16 Mar. 15, 2010.)

Oscar now moves to certify the following nationwide class and New York sub-class pursuant to Rule 23(a) and (b)(3):

**<u>Nationwide Class:</u>**

All consumers who purchased or leased new 2005, 2006, 2007, 2008, and 2009 MINI vehicles equipped with Run-Flat Extended Mobility Technology tires manufactured by Goodyear and sold or leased in the United States whose Tires have gone flat and been replaced.

**<u>New York Sub-Class:</u>**

All consumers who purchased or leased new 2005, 2006, 2007, 2008, and 2009 MINI vehicles equipped with Run-Flat Extended Mobility Technology tires manufactured by Goodyear and sold or leased in the State of New York whose Tires have gone flat and been replaced.

---

[2] Dunlop is an affiliate of Goodyear; however, Dunlop tires are not the subject of the present suit.

**DISCUSSION**

Pursuant to Rule 23(a), plaintiffs must demonstrate that four conditions have been met before a court will certify a class:  (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a); *Teamsters Local 445 Freight Div. v. Bombardier*, 546 F.3d 196, 201-02 (2d Cir. 2008). In addition, plaintiffs must demonstrate that a class action is maintainable under one of several different theories.  Here, plaintiff argues that the class action is maintainable pursuant to Rule 23(b)(3), which requires a court to find (1) that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and (2) that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  Fed. R. Civ. P.23(b)(3).  *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010). The plaintiff bears the burden of showing each of these elements by a preponderance of the evidence.  *Teamsters Local*, 546 F.3d at 202.

**I.   Rule 23(a) Requirements**

*A.   Numerosity*

"There is no magic minimum number that establishes numerosity," *U.S. Fid. and Guar. Co. v. Madison Fin. Corp.*, 2002 WL 31731020, at *6 (S.D.N.Y. Dec. 4, 2002), but "numerosity is presumed at a level of 40 members," *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).  In addition to the Rule 23(a) numerosity requirement, the MMWA imposes a jurisdictional numerosity requirement of its own, disallowing MMWA class actions from going forward unless the plaintiffs number 100 or more.  15 U.S.C. § 2310(d)(3)(C).

5

Plaintiffs may rely on reasonable inferences drawn from available facts in establishing numerosity, particularly where, as here, more precise information about the size of the class is within the defendants' control.  *See German v. Federal Home Loan Mortg. Corp.*, 885 F. Supp. 537, 552 (S.D.N.Y. 1995) ("Lack of knowledge of the exact number of persons affected is not a bar to certification where the defendants alone have access to such data").

At the outset, the Court notes that the evidence that Oscar has presented is significantly weaker than the evidence offered in another RFT case, *Marcus v. BMW of N. Am., LLC*, 2010 WL 4853308 (D.N.J. Nov. 19, 2010).  There, the court found that the numerosity requirement had been satisfied for both a nationwide class and New Jersey sub-class of BMW owners and lessees of vehicles equipped with Bridgestone RFTs whose tires had gone flat and been replaced.[3]  *Id*. at *1.  The *Marcus* plaintiff produced evidence that BMW had sold or leased more than 900,000 vehicles nationwide and received 600 customer contacts regarding RFTs, of which 196 made specific complaints about Bridgestone RFTs.  *Id*. at *3.  Based on this evidence, the court concluded that the number of complaints by BMW owners whose cars were equipped with Bridgestone RFTs permitted the court to "reasonably estimate" that the class was sufficiently numerous to establish numerosity on the national level.  *Id*.  The court, acknowledged, however that making a numerosity determination was more difficult for the state subclass.  The plaintiff in *Marcus* conducted a sample of 29 of the 600 customer contacts of which only two were New Jersey residents complaining about Bridgestone RFTs.  *Id*.  The *Marcus* court inferred that these two New Jersey complaints represented a small sample of the total customer contacts and that the number of customers who actually complained represented but a fraction of the total

---

[3] As discussed below, the *Marcus* court denied certification of a nationwide class because the need to apply the warranty law of all fifty states resulted in the predominance of individual issues in contravention of Rule 23(b). *Marcus*, 2010 WL 4853308, at *9.

customers that had had flat tires.  *Id*.  Using "common sense," the court concluded that the sub-class would be greater than forty.  *Id*.

In contrast, Oscar has presented only very sketchy information in support of numerosity. During the class period, 157,345 MINIs equipped with RFTs were distributed in the United States.  (Def.'s Opp'n 16.)  2,117 MINI Cooper S vehicles, all of which are equipped with RFTs, were sold in New York in 2006.  (Pl.'s Mem. 15.)  Oscar has not presented evidence of how many MINIs were leased with RFTs in 2006, how many MINI cars of other models were sold or leased in 2006, or how many MINIs were sold or leased in New York for years other than 2006. In addition, Oscar has not presented data of how many of the MINIs sold with RFTs were equipped with Goodyear RFTs, though his failure to do so results from BMW's asserted inability to produce this information.  (Pl.'s Ex. 29, ¶¶ 9-10.)

In support of the proposition that a sufficiently numerous group of MINI drivers have experienced difficulty with Goodyear RFTs, Oscar points first to a Goodyear press release that states that as of 2002, "over 80% of MINIs in the US are equipped with either Goodyear or Dunlop brand run-flat tires."  (Pl.'s Mem. 15.)  The proposed class period would run from 2005-2009.  It is impossible to determine from this one piece of information how many MINIs were equipped with Goodyear tires in 2002, let alone for the five years that make up the class period. The Court is sensitive to the fact, however, that BMW is in a much better position than Oscar to provide hard data as to the number of cars sold equipped with Goodyear RFTs, yet BMW represented to Oscar that it was unable to state "precisely" how many MINIs were so equipped. (Pl.'s Ex. 29, ¶ 10.)  The Court is reluctant to reward BMW for its inability or unwillingness to produce responsive information to Oscar's discovery requests.

Even assuming that a substantial number of MINIs were equipped with Goodyear RFTs, Oscar has further difficulties in demonstrating the failure rate that Goodyear RFTs experienced. The proposed class is limited to MINI owners whose *Goodyear* RFTs have failed.  Oscar points to survey data from J.D. Power that a substantial number of MINI owners experienced tire punctures within two years of purchase over the class period.  These numbers ranged from a low of 11.3% to 41.2% of vehicle owners depending on the year.  (Pl.'s Ex. 15).  These figures are startlingly high, but they do not reveal whether any particular maker's RFTs were chiefly responsible for the punctures, nor has Oscar demonstrated that the problems with RFTs are uniform across types.  It would be entirely consistent with the figures that Oscar has produced if another maker of RFTs manufactured an extremely faulty tire and that those tires were responsible for the high puncture rates that J.D. Power turned up.  This data is markedly different from the data at issue in *Marcus*, where the plaintiff demonstrated that a number of customers had complained about Bridgestone RFTs in particular.

Still, the Court is conscious of the fact that it does not make a merits determination when certifying a class.  In other words, the Court need not determine why the RFTs failed at this juncture.  Even if the court were to assume that a mere 5% of the MINIs distributed nationwide during the class period were equipped with Goodyear RFTs (a seemingly conservative figure), a mere 1.3 % of MINI drivers with Goodyear RFTs would have to have experienced a flat to bring the puncture rate above the hundred-person threshold.  If the Court instead assumes that Goodyear RFTs represented 40% of the market, that number would drop to .14%.

It is more difficult to calculate these numbers for the MINIs sold in New York.  In response to a discovery request that BMW indicate "the number of consumers that purchased Vehicles with the [Goodyear RFTs]" in New York, BMW provided documentation only for

Model Year 2006 MINI Cooper 'S' Vehicles all of which were equipped with RFTs, though the brand is unknown.  (Pl.'s Ex. 29, ¶ 10.)   BMW sold 2,117 2006 MINI Cooper 'S' Vehicles in New York.  (Pl.'s Ex. 27.)  As stated above, this figure does not include lessees, and it does not encompass all models of MINI cars that could be equipped with RFTs.  The Court cannot speculate regarding the total number of people who bought or leased a MINI of any model with RFTs for the class period.  The Court can assume, however, that if BMW sold 2,117 MINI Cooper 'S' vehicles in 2006, it sold the same number for every other year of the class period.  If the Court assumes that 40% of those cars were equipped with Goodyear RFTs, .9% these owners would have to have had a flat for there to be 40 tire punctures.  If Goodyear RFTs only represented 5% of the market, 7.6% would have to have been punctured for there to be 40 New York class members.

Courts have relied upon such back-of-the-envelope calculations in finding numerosity satisfied.  For example, in *In re Amaranth Natural Gas Commodities Litig.*, Judge Schiendlin examined whether a sufficient number of individuals had made a certain kind of trade.  269 F.R.D. 366, 379 (S.D.N.Y. 2010).  Noting that the number of floor traders numbered in the thousands and that trades by floor traders made up only a small percentage of total trades made, "even if the subset of traders holding the long and/or short positions required to qualify for class membership under the proposed definition is a relatively small subset of the total number of NYMEX traders, it is highly likely that the class will be sufficiently large to meet the numerosity requirement."  *Id.  See also Argento v. Wal-Mart Stores, Inc.*, 888 N.Y.S. 2d 117, 119 (N.Y. App. Div. 2009) (finding numerosity satisfied in a case where plaintiff alleged that Sam's Club had a policy of overcharging customers in certain cases for membership dues based on the huge number of Sam's Club members).  And the *Marcus* court made similar assumptions when

9

finding numerosity had been satisfied for the New Jersey subclass. *Marcus*, 2010 WL 4853308, at *3. Still, "[w]here the plaintiff's assertion of numerosity is pure speculation or bare allegations, the motion for class certification fails." *Edge v. C. Tech Collections, Inc.*, 203 F.R.D. 85, 89 (E.D.N.Y. 2001) (holding that numerosity was not satisfied where the plaintiff alleged that a defendant must have sent out a number of a particular type of debt notices because the defendant was a large debt collection agency).

This case falls right on the border between appropriate inference and inappropriate speculation. Nationally, the percentage of MINI drivers who have experienced a flat Goodyear RFT would need to be miniscule in comparison to the total number of cars imported for numerosity to be satisfied. As such, the Court holds, especially in light of the fact that Oscar requested more precise information from BMW and BMW was unable to provide this information, that Oscar has satisfied the requirement of numerosity for the nationwide class.

But numerosity for the New York subclass is a much closer question. The *Marcus* court found numerosity satisfied for the New Jersey subclass presented there, reasoning that the few New Jersey complaints about Bridgestone RFTs presented to the court represented a fraction of the total RFT failures in New Jersey. *Marcus*, 2010 WL 4853308, at *3. That case was different, however, because the plaintiffs presented evidence that Bridgestone RFTs in particular were prone to failure, whereas Oscar has made a case merely that some MINI RFTs, but not necessarily Goodyear RFTs, are prone to damage. In order to hold that numerosity has been satisfied for the New York subclass, the Court would be required to make unsupported inferences, and the Court is unwilling to assume on the information presented either that Goodyear RFTs made up a particularly large portion of the market share during the class period

or that Goodyear RFTs had a particularly high puncture rate.  The Court holds that numerosity has not been satisfied for the New York sub-class.

B. *Commonality*

Commonality requires a showing that "there are questions of law or fact common to the class."  Rule 23(a); *see also Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC*, 504 F.3d 229, 245 (2d Cir. 2007) (hereinafter "*Cent. States*").  "A court may find a common issue of law even though there exists some factual variation among class members' specific grievances."  *Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 37 (E.D.N.Y. 2008).

Oscar contends that commonality is satisfied because the potential class members' claims share the common contention that Goodyear RFTs are "highly susceptible to road hazard damage, are unrepairable in the event of a small puncture, are exorbitantly expensive to replace, that MINIs cannot be reconfigured to use with conventional tires, that MINIs did not come with a spare tire, and that BMW NA knew of these issues and failed to disclose them to Plaintiff and the Class."  (Pl.'s Mem. 16.)  BMW argues that commonality is not satisfied because Oscar has not made a sufficient showing that the tires share this common defect and because Oscar's argument that the tires are "expensive" is overly subjective.  (Def.'s Opp'n 18-20.)

Oscar's ultimate inability to demonstrate a common defect presents troubling issues for his case, but it does not defeat commonality.  In *In re Initial Pub. Offering Sec. Litig.*, the Second Circuit instructed lower courts not to shy away from fully exploring whether each of the Rule 23 requirements had been met merely because such exploration would involve some merits analysis. 471 F.3d 24, 41 (2d Cir. 2006).  Nonetheless, in urging the Court to deny class certification because it believes Oscar will lose on the merits, BMW ignores the clear language of Rule 23(a).

11

The court is to conduct an inquiry into whether "there are *questions* of law or fact common to the class." Rule 23(a) (emphasis added). This inquiry does not require the court to find that the answers to those questions will be decided in the plaintiff's favor. Oscar has demonstrated that the Class claims will all share the common question of whether the Goodyear tires were defective. BMW's only challenge to Oscar's deceptive practices claims is that Oscar's argument that RFTs are expensive is overly subjective. BMW argues that different drivers might have different views about whether RFTs are expensive and might be willing to pay for RFTs as a safety feature. BMW seems to argue that the issue of expense is not a common question because other MINI drivers will not consider RFTs expensive. This argument is without merit. It is clear that Oscar means to draw a comparison between RFTs and radial tires. It does appear that RFTs are more expensive than radial tires. It is therefore a question common to the class whether BMW behaved deceptively by not alerting MINI drivers to this fact. Commonality is therefore satisfied.

   *C. Typicality*

   "Typicality requires that the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Century States*, 504 F.3d at 245 (internal quotations omitted). Oscar makes essentially the same arguments in favor of typicality as he does in favor of commonality (Pl.'s Mem. 17-19), as is appropriate given that "[t]he commonality and typicality requirements often tend to merge into one another, so that similar considerations animate analysis of both." *Brown v. Kelly*, 609 F.3d 467, 475 (2d Cir. 2010). BMW argues that Oscar is atypical of the class both with respect to the deceptive practices claims and with respect to the implied warranty claims.

BMW makes two arguments against Oscar's typicality for the deceptive practice claims. Its first argument, that Oscar's claim that BMW instructed MINI owners not to repair their tires is untrue, can be easily disposed of.  BMW argues that the statement upon which Oscar relies does not mean what Oscar says it means, in other words, that BMW does not "prohibit" drivers from repairing RFTs, but merely "recommends" against it.  (Defs.' Opp'n 18.)  This is not an argument regarding whether the class members' claims arise from the same course of events, but rather an argument about Oscar's likelihood of success on the merits.  It thus does not defeat typicality.

BMW's next argument regarding BMW's allegedly deceptive practices is a little trickier. BMW argues that Oscar's claims are not typical because Oscar, unlike other potential class members, did not attempt to educate himself about the car before he purchased it.  If he had, he would have come across negative reviews of MINI's RFTs.  BMW cites *Kelesceny v. Chevron, U.S.A., Inc.*, 262 F.R.D. 660 (S.D. Fla. 2009), in support of this argument.  There, the plaintiff argued that gasoline distributors failed to warn him that gasoline containing ethanol was unsuitable for use on boats with a particular type of gas tank.  *Id*. at 665.  The court held that plaintiff failed to establish typicality because he, unlike the typical owner, filled up his boat's tank not at marina gas stations, but rather at filling stations around Florida.  *Id*. at 671.  Marina gas stations were more likely to have warnings that ethanol-containing gasoline was unsuitable for use on certain boats.  *Id*. at 672.  The plaintiff was atypical because he had a different level of knowledge than other consumers.  BMW argues that Oscar also was atypically ignorant, so he was not typical of the class.

The analogy that BMW draws between these two cases is not apt.  It is true that the defendant in *Kelesceny*, like BMW here, argued that the plaintiff was not typical because his

level of knowledge was not typical of the class.  But what differs is the source of other class members' knowledge.  In *Kelesceny*, other class members had received warnings from their usual gas station, in other words, a source in the distribution chain.  BMW argues that other class members may have gained information from sources not at all affiliated with BMW.  Even if some class members did have additional information regarding the quality of the MINI RFTs, this knowledge would not vitiate BMW's basic responsibility to avoid providing consumers with materially misleading information.

BMW argues that Oscar is not a typical class member with respect to his warranty claims because he is subject to unique defenses.  Typicality is absent where the named plaintiffs are "subject to unique defenses which threaten to become the focus of the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 222 F.3d 52, 59 (2d Cir. 2000).  "The rule barring certification of plaintiffs subject to unique defenses is not rigidly applied in this Circuit; rather, it is generally applied only where a full defense is available against an individual plaintiff's action. The test is whether the defenses will become the focus of the litigation, thus overshadowing the primary claims, and prejudicing other class members." *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 93-94 (S.D.N.Y. 2010) (internal citations and quotations omitted).  The typicality requirement "does not require that the factual background of each named plaintiff's claim be identical to that of all class members; rather, it requires that the disputed issue of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class." *Caridad v. Metro-N. Commuter R.R.*, 191 F.3d 283, 293 (2d Cir. 1999).

BMW does not flesh out fully its argument that Oscar is subject to unique defenses. (Def.'s Opp'n 19-20.)  Rather, BMW asserts that Oscar is subject to a number of defenses and

throws privity of contract out as an example, without any further explanation. Even if Oscar is subject to the defense of privity, BMW has not established that this defense (at least as it relates to Oscar) threatens to become the focus of litigation. The Court is persuaded by Oscar's claim that he is typical of the members of his class.

### D.  Adequacy

The final requirement of Rule 23(a) is that "the representative parties will fairly and adequately represent the interests of the class." In order to satisfy this requirement, the plaintiff must demonstrate that class counsel is qualified, experienced, and generally able to conduct the litigation and that that there is no conflict of interest between the named plaintiffs and other members of the plaintiff class. *Marisol A. v. Giuliani*, 126 F.3d 372, 378 (2d Cir. 1997).

Oscar argues that he is an adequate class representative because he has been actively involved in the strategy in this case and does not have interests that are antagonistic to the class. BMW argues that he is not an adequate representative because his tires would have failed regardless of any defect. In support of this assertion, BMW offers scanty factual support, pointing merely (at another point in the brief) to the fact that one tire had been punctured by a nail that went all the way through the sidewall of the tire. (Def.'s Opp'n 11.) Even assuming *arguendo* that BMW has sufficiently demonstrated that this one particular tire would have required replacement regardless of potential defects, it certainly has not demonstrated that *all* of the tires would have. Oscar has adequately alleged that his tires failed because of a defect, so he himself is an adequate representative. [4]

---

[4] While BMW does not contest that plaintiff's counsel is adequate, the Court notes that Oscar has simply failed to address the issue.

## II. Rule 23(b)(3)

In addition to satisfying the threshold requirements of Rule 23(a), the plaintiff must also satisfy the more exacting requirements of Rule 23(b).  Plaintiffs must establish that they meet one of the three alternative conditions of Rule 23(b).  Oscar argues that class treatment is appropriate under Rule 23(b)(3), which requires that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and . . . [that] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "[T]o find predominance, a Court must consider the elements of each cause of action, and determine whether those elements can be satisfied by common, class-wide proof."  *In re Currency Conversion Fee Antitrust Litig.*, 230 F.R.D. 303, 309-10 (S.D.N.Y. 2004).  Common questions predominate only if plaintiffs can show that "those issues in the proposed action that are subject to generalized proof outweigh those issues that are subject to individualized proof."  *Heerwagen v. Clear Channel Commc'ns.*, 435 F.3d 219, 226 (2d Cir. 2006).  The Court is not satisfied that common claims predominate for either the nationwide class or the New York subclass.

### A. *Nationwide Class*

Oscar seeks to certify a nationwide class to bring suit under the MMWA for breach of the implied warranty of merchantability.  But there are significant individual legal and factual questions for these claims that defeat predominance.  The MMWA provides consumers with a federal cause of action against warrantors for breach of an implied warranty.  15 U.S.C. § 2310(d)(1).  The MMWA does not create additional bases for recovery, but rather federalizes existing state law causes of action.  *See Diaz v. Paragon Motors of Woodside*, 424 F. Supp. 2d 519, 540 (E.D.N.Y.2006).  The MMWA defines "implied warranty" as "an implied warranty

16

arising under state law in connection with the sale by a supplier of a consumer product."  15

U.S.C. § 2301(7).  Federal courts have been "reluctant" to certify nationwide classes under the

MWWA.  *Marcus*, 2010 WL 4853308, at * 7.  One reason for this reluctance is that differences

in state laws often predominate over common questions.  "In a motion for class certification,

plaintiffs bear the burden of providing an extensive analysis of state law variations to determine

whether there are 'insuperable obstacles' to class certification."  *In re Currency Conversion Fee

Litig.*, 230 F.R.D. at 312; *see also Steinberg v. Nationwide Mut. Ins. Co.*, 224 F.R.D. 67, 76

(E.D.N.Y. 2004).

Although Oscar concedes that the law of the fifty states plus the District of Columbia

would apply to the members of the nationwide class, he argues that the differences between the

states' laws on implied warranty claims are negligible because the implied warranty is a Uniform

Commercial Code claim.  The UCC provides: "Unless excluded or modified (Section 2-316), a

warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is

a merchant with respect to goods of that kind."  UCC § 2-314(1).  But numerous courts have

recognized that there are significant variances among the interpretation of the elements of an

implied warranty of merchantability claim among the states.  *See Walsh v. Ford Motor Co.*, 807

F.2d 1000, 1016 (D.C. Cir. 1986) (Ginsburg, Ruth Bader, J.) ("The Uniform Commercial Code is

not uniform.").  For example, in *In re Ford Motor Co. Ignition Switch Litig.*, the District of New

Jersey declined to certify a nationwide class bringing implied warranty of merchantability claims

under the laws of the several states.  194 F.R.D. 484, 489 (D.N.J. 2000).  The court found that

significant differences existed with respect to each state's definition of merchantability, whether

the remedy was a tort or contract remedy, and whether the state allows waiver of the implied

warranty.  *Id*.  The Fifth Circuit addressed the same question in *Cole v. Gen. Motors Corp.*, 484

F.3d 717, 726-30 (5th Cir. 2007), and also declined to certify a class bringing express and implied warranty claims for much the same reasons.  *See also Feinstein v. Firestone Tire & Rubber Co.*, 535 F. Supp. 2d 595, 605-06 (S.D.N.Y. 1982).

This case presents even greater difficulty than *In re Ignition Switch Litig.* because there, the plaintiffs restricted their proposed class to states that do not require privity between the individual bringing the claim and the defendant.  194 F.R.D. at 489.  Here, Oscar proposes to include states with a privity requirement, in part because New York itself requires privity.  In ruling upon BMW's motion to dismiss, the Court held that Oscar had adequately alleged privity through a privity-by-agency theory.  (Motion to Dismiss Hr'g Tr. 35:5-36:14 Mar. 15, 2010.) Oscar argues that he will be able to establish privity for the twenty-one privity states through a theory of privity-by-agency.  But he has cited case law suggesting that this theory has been accepted merely from two other states and has provided no information regarding the remaining privity states (Pl.'s Reply 18), hardly the "extensive analysis" the courts require, *In re Currency Conversion Fee Litig.*, 230 F.R.D. at 312.

Further, in *Curl v. Volkswagen of Am., Inc.*, 114 Ohio St. 3d 266, 273 (Ohio 2007), a case relied upon by Oscar, the Ohio Supreme Court looked to the Second Restatement on Agency to determine whether privity had been established.  The Restatement provides:

> One who receives goods from another for resale to a third person is not thereby the other's agent in the transaction: whether he is an agent for this purpose or is himself a buyer depends upon whether the parties agree that his duty is to act primarily for the benefit of the one delivering the goods to him or is to act primarily for his own benefit.

Restat. (2d) of Agency, § 14J (1958).  This test suggests that in Ohio, and perhaps in other jurisdictions, the question of whether privity-by-agency has been established involves a fact-intensive inquiry into the intent of BMW and its dealerships in entering into an agreement for the

18

dealership to sell MINIs.  The plaintiffs would be required to demonstrate privity-by-agency for each transaction.  Such an inquiry could easily swamp common questions.

Oscar has also failed to demonstrate that common questions of fact predominate.  Indeed, at oral argument, Oscar was unable to identify a common defect, merely hypothesizing that the failure rate could stem from the RFTs' stiffness and stating that further discovery would be necessary to ascertain the nature of the defect.  By comparison, the plaintiff in *Marcus* presented better evidence suggesting a defect in the particular brand of tires at issue there.  *Id.* at *3.  In addition, the plaintiff "offered evidence that because run-flat tires are, universally, substantially stiffer than conventional tires, they are therefore more susceptible to road hazard damage."  *Id.* at *14.  Oscar has not provided the court with any evidence that Goodyear RFTs are likely to fail because of a particular defect.  The failure to specify an alleged common defect provides a further basis for concluding that plaintiff has not demonstrated predominance.  *See Am. Honda Motor Co. v. Allen*, 630 F.3d 813, 819 (7th Cir. 2010) (holding predominance was not satisfied where forty-one plaintiffs owners alleged that their motorcycles wobbled, but failed to provide competent evidence that a common defect underlay their claims).

But even if Oscar had put forth evidence of a common defect, it is not clear that this case would be appropriate for class treatment.  Several courts have noted that breach of warranty suits involving motor vehicles often involve complicated issues of individual causation that predominate over common questions regarding the existence of a defect.  *See, e.g.*, *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1018-19 (7th Cir. 2002) (noting that class treatment of tire defect litigation was unmanageable in part because individual factors could affect the alleged tire failure); *Sanneman v. Chrysler Corp.*, 191 F.R.D. 441, 451-52 (E.D. Pa. 2000) (declining to certify a class of vehicle owners whose paint had delaminated allegedly because of

a faulty painting process in part because the paint could delaminate for reasons other than the alleged defect); *In re Ignition Switch Litig.*, 194 F.R.D. at 490-91 (declining to certify a class of vehicle owners whose passenger compartments caught on fire allegedly because of a faulty ignition switch because issues of individual causation would predominate); *Feinstein v. Firestone Tire and Rubber Co.*, 535 F. Supp. 2d 595, 603 (S.D.N.Y. 1982) (declining to certify a class of tire purchasers because of "myriad [individual] questions," including "other possible causes of the problem encountered"); *see also Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1172-74 (9th Cir. 2010) (holding that the district court erred in finding that individual issues predominated with respect to a defective steering alignment design that caused tire wear, but noting that defective tire design claims, by contrast, "do not easily satisfy the predominance test" because "[t]ires deteriorate at different rates depending on where and how they are driven"). *But see Marcus*, 2010 WL 4853308, at *14-15.

It appears that similar issues of causation will predominate here.  Even if the plaintiffs were to show that the Goodyear RFTs suffered from a common defect, they would still need to demonstrate that this defect caused each class member's RFT to puncture.  But tires can puncture for any number of reasons, and not all of these reasons will relate to the defect.  As defendants properly note, RFTs can go flat for reasons that would also cause a standard radial tire to go flat, for example, if the driver ran over a nail, tire shredding device, or large pothole, or if a vandal slashed the tire.  (Defs.' Opp'n 21.)  In order to demonstrate MINI's liability, plaintiff would have to demonstrate in each individual case that the tire punctured for reasons related to the defect, rather than for a reason that would cause any tire to fail.  Individualized issues of causation would thus swamp the common inquiry into an as yet to be identified tire design defect.

20

B. *New York Sub-Class*

As discussed above, the Court has already found that the plaintiff has failed to demonstrate by a preponderance of the evidence that the numerosity requirement is met with respect to the New York sub-class.  The Court will briefly examine whether Oscar's claims satisfy predominance with respect to the New York sub-class.

1. *Express Warranty Claims*

Oscar's New York claims that BMW breached the terms of its express warranty are inappropriate for class treatment for much the same reasons that his nationwide MMWA claims are inappropriate for class treatment.  "To prevail on a claim of breach of express warranty, a plaintiff must show 'an affirmation of fact or promise by the seller, the natural tendency of which was to induce the buyer to purchase and that the warranty was relied upon.'" *Factory Assocs. & Exps., Inc. v. Lehigh Safety Shoes Co., LLC*, 382 F. App'x 110, 111 (2d Cir. 2010) (quoting *Schimmenti v. Ply Gem Indus., Inc.,* 549 N.Y.S.2d 152, 154 (N.Y. App. Div. 1st Dep't 1989)). In addition, "[w]hether an action is pleaded in strict products liability, breach of warranty, or negligence, the plaintiffs must prove that the alleged defect is a substantial cause of the events which produced the injury." *Fahey v A.O. Smith Corp.*, 908 N.Y.S.2d 719, 723 (N.Y. App. Div. 2d Dep't 2010).  As discussed above, proving the element of causation will require a fact intensive inquiry into the causes of each Goodyear RFT's failure.  In each case, the plaintiff will need to demonstrate that the Goodyear RFT failed because of a common defect, rather than because of circumstances that would cause any tire to fail.  This inquiry into individual causation will predominate over issues of common proof surrounding the existence of a defect.  As such, these claims are inappropriate for class treatment.

### 2.   Breach of Contract Claims

Oscar's contract claim appear to merge into his express warranty claims; the gravamen of his contract claim seems to be that BMW did not provide him with a car free from defects, as it promised to do under the terms of the contract.  These claims are not appropriate for class certification for the same reason as his express warranty claims.

### 3.   Breach of Implied Warranty

A breach of implied warranty claim requires proof of the following three elements: "(1) that the product was defectively designed or manufactured; (2) that the defect existed when the manufacturer delivered it to the purchaser or user; and (3) that the defect is the proximate cause of the accident." *Silivanch v. Celebrity Cruises, Inc.,* 171 F. Supp. 2d 241, 259 (S.D.N.Y.2001). In short, the implied warranty is breached where the product in question is not fit for the ordinary purpose for which it is to be used.  *See Denny v. Ford Motor Co.,* 662 N.E.2d 730, 736 (N.Y. 1995) (citing N.Y. U.C.C. § 2-314(2)(c)).  Here again, Oscar has not demonstrated to the Court's satisfaction that common questions regarding the alleged defect would predominate over individual questions regarding the cause of the class members' tire punctures.  Demonstrating proximate causation, a necessary element of a breach of implied warranty claim, will require an individualized inquiry into the circumstances of each RFT's failure.  These inquiries will swamp common questions.  Class certification is not appropriate for these claims.

### 4.   New York Gen. Bus. Law §§ 349 and 350 Claims

To make out a cause of action under Gen. Bus. Law. § 349, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *City of New York v. Smokes-Spirits.Com, Inc.*, 911 N.E.2d 834, 839 (N.Y. 2009).  "Intent to defraud and

justifiable reliance by the plaintiff are not elements of the statutory claim. However, proof that a material deceptive act or practice caused actual, although not necessarily pecuniary, harm is required to impose compensatory damages." *Small v. Lorillard Tobacco Co.*, 720 N.E.2d 892, 897 (N.Y. 1999). "The standard for recovery under General Business Law § 350, while specific to false advertising, is otherwise identical to section 349." *Goshen v. Mut. Life Ins. Co.*, 774 N.E.2d 1190, 1195 n.1 (N.Y. 2002). Oscar alleges that BMW violated these provisions by failing to disclose that the tires are fragile, expensive, and impossible to repair and that MINIs do not have a spare tire and cannot be fitted for use with conventional tires. (Pl.'s Mem. 22.)

Plaintiff correctly points out that courts are generally more likely to grant class certification in § 349 and § 350 cases where the plaintiff, as here, alleges an omission or general deceptive policy rather than a misstatement. *Jermyn*, 256 F.R.D. at 435; *Dupler*, 249 F.R.D. at 44. Because the defendant did not make any affirmative deceptive statement, but is alleged to have deceived the public by not disclosing certain information, plaintiffs will not need to make a showing that "all members of the class were exposed to the same misrepresentations." *Solomon v. Bell Atl. Corp.*, 777 N.Y.S.2d 50, 53 (N.Y. App. Div. 1st Dep't 2004).

Still, Oscar must demonstrate that individual issues do not predominate with respect to the injuries that each plaintiff suffered. Oscar alleges that he was injured by BMW's deception in three ways: (1) he would not have purchased his MINI if he had known that its tires were so susceptible to puncture (Am. Compl. ¶ 79); (2) he paid more than he would have (*id.*); and (3) he experienced a number of flat tires and had to pay to replace them (*id.*, ¶ 80). Case law forecloses class certification on the basis of the first and third forms of injury.

In *Small v. Lorilland Tobacco Co., Inc.*, the Court of Appeals held that common issues did not predominate for a class of cigarette smokers who claimed that they were deceived by

tobacco companies that "secretly used chemicals to enhance the addictive propensities of nicotine" and "suppressed research indicating that nicotine is addictive."  720 N.E.2d 892, 895 (N.Y. 1999).  Plaintiffs alleged that they would not have purchased cigarettes if they had known about the dangers of smoking.  *Id*. at 898.  The court described this formulation of the injury as "legally flawed."  *Id*.  It observed that in order to make out a claim under a deceptive practices theory, plaintiffs must demonstrate actual injury.  *Id*.  The court concluded that plaintiffs' argument, that they were injured because they did not make a free and informed decision, was legally equivalent to claiming deception itself as injury and held that being deceived is not a cognizable injury under §§ 349 and 350.  *Id*.  Thus, Oscar's claim that he would not have purchased his MINI if he had known of the alleged defect does not state an injury.

Individualized issues also predominate with respect to the injury of replacing the tires. Where the link between the defendant's alleged deception and the injury suffered by plaintiffs is too attenuated and requires too much individualized analysis, courts will not certify a class.  *See, e.g.*, *Pelman v. McDonald's Corp.*, 272 F.R.D. 82 (S.D.N.Y. 2010) (declining to certify a class of juveniles allegedly misled by McDonald's claims that its food was healthy and who eventually suffered diseases including obesity, pediatric diabetes, and high blood pressure because there were too many factors other than the consumption of McDonald's foods that could contribute to these diseases, so individual issues would predominate).  As described more fully above, determining whether each tire failed as a result of the allegedly concealed defect or as a result of unrelated issues, *e.g.*, potholes or reckless driving habits, will devolve into numerous mini-trials.

The Court of Appeals has suggested in dicta that Oscar's injury that he paid more for the car than he would have otherwise is a cognizable injury under a § 349 or § 350 claim.  *See Small*, 720 N.E.2d at 898 (distinguishing a claim that the plaintiff would not have purchased cigarettes

24

from a claim that "the cost of cigarettes was affected by the alleged misrepresentation"). But Oscar has adduced absolutely no evidence that he could demonstrate on a class-wide bases that consumers would have paid less for their MINIs if they had known that the tires were susceptible to puncture. In *Weiner v. Snapple Beverage Corp.*, plaintiff made a claim similar to the one advanced here, arguing that consumers paid more Snapple because it was labeled "all natural," even though the product contained high-fructose corn syrup. No. 07 Civ. 8742, 2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010). Judge Cote declined to certify a class of deceptive practices claims because plaintiff had not demonstrated through a "reliable methodology" that plaintiffs paid a premium because of the all natural labeling. *Id.* at *6.

This case presents slightly different issues from *Weiner*. In *Weiner* there was some evidence that consumers did not care about the "all natural" labeling at all because consumers paid the same price for Diet Snapple, which did not contain an all natural label. *Id.* at *10 n.19. Whether MINI purchasers would have paid less for their cars had defendant disclosed an increased risk of tire failure is unknown. But Oscar has not produced any evidence on this issue, nor has Oscar addressed how the fact of damage—let alone the amount—could be established on a class-wide basis. Thus, the Court is left to conclude that, on the present record, Oscar has not carried his burden in demonstrating that commonissues predominate with respect to his §§ 349 and 350 claims.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for class certification [51] is DENIED.

Plaintiff may seek leave to renew as to the New York sub-class in the event that he can make an

appropriate showing on numerosity and predominance.

SO ORDERED.

Dated: New York, New York

June **7**, 2011

Richard J. Holwell

United States District Judge