UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                                :

GERALD OSCAR, *individually and on behalf of all others* :
*similarly situated*,                                                 :

                                  Plaintiff,                      :          09 Civ. 11 (PAE)

                  -v-                             :          <u>OPINION & ORDER</u>

BMW OF NORTH AMERICA, LLC et al.,          :

                                Defendants.      :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

      Plaintiff Gerald Oscar brings his second motion to certify a New York class of purchasers of MINI vehicles with Goodyear run-flat tires ("RFTs"), who were allegedly deceived, in violation of N.Y. General Business Law § 349,[1] by defendant BMW of North America's ("BMW") defective disclosures regarding the reliability and replacement cost of the RFTs fitted on MINI vehicles. For the following reasons, Oscar's motion is, again, denied.

**I.    Background**

      The Court assumes familiarity with the background and procedural history of this matter, which are set forth at length in three prior opinions. In the most recent, this Court denied Oscar's motion for reconsideration of his motion for leave to amend his complaint. *Oscar v. BMW of N. Am.*, No. 09-cv-11, 2012 U.S. Dist. LEXIS 9230 (S.D.N.Y. Jan. 25, 2012). Previously, the Court denied Oscar's motion for leave to amend his complaint as both untimely and prejudicial to

---

[1] Oscar initially brought this motion seeking to certify a class pursuant to N.Y. Gen. Bus. L §§ 349–50. However, in his reply brief, Oscar withdrew the portion of his motion seeking certification under § 350. *See* Oscar Reply 7 n.3 (Dkt. 100).

[1]

BMW. *Oscar v. BMW of N. Am.*, No. 09-cv-11, 2011 U.S. Dist. LEXIS 146395 (S.D.N.Y. Dec. 20, 2011). In an earlier opinion, the Honorable Richard J. Holwell, to whom this case was previously assigned, had denied Oscar's first motion for class certification. *See Oscar v. BMW of N. Am.*, 274 F.R.D. 498 (S.D.N.Y. 2011). As relevant here, in denying Oscar's prior certification motion, Judge Holwell noted that Oscar "may seek leave to renew [the motion] as to the New York sub-class in the event that he can make an appropriate showing on numerosity and predominance." 274 F.R.D. at 513.

That renewed motion is now before the Court. The class Oscar seeks to certify is defined as:

> All consumers who purchased or leased new 2005, 2006, 2007, 2008 and 2009 MINI vehicles equipped with Run-Flat Extended Mobility Technology tires manufactured by Goodyear and sold or leased in the State of New York . . . whose tires have gone flat and been replaced.

Oscar Br. 1. On February 10, 2012, Oscar filed the instant motion. (Dkt. 93.) On February 24, 2012, BMW filed its opposition. (Dkt. 96.) On March 5, 2012, Oscar submitted a reply. (Dkt. 100.)

## II. The Parties' Arguments

Oscar argues that he has satisfied both the numerosity and predominance requirements of Federal Rule of Civil Procedure 23.

As to numerosity, Oscar claims that he has sufficiently shown that more than 40 New York residents purchased MINI vehicles with Goodyear RFTs which subsequently punctured. First, he extrapolates from materials obtained from road hazard warranty companies during third-party discovery. Oscar Br. 3–7. Second, he points to a report from J.D. Power & Associates, a market research company, and media reports, both of which, he contends, show that a significant number of MINIs' RFTs punctured during the class period. *Id.* at 7–8. Finally, Oscar points to

[2]

the conclusion of his expert witness that approximately 27% of MINIs nationwide would be expected to have suffered tire failure between June 2005 and April 2010. *Id.* at 8.

As to predominance, Oscar argues that the purchase price injury he asserts is cognizable under N.Y. Gen. Bus. L. §§ 349–50, and that all class members similarly suffered from BMW's failure to disclose that: (1) there was no spare tire on the MINI; (2) RFTs cannot be repaired; (3) RFTs cost more than regular tires to replace; and (4) replacing RFTs entails more "inconvenience and delay" than replacing a normal tire. *Id.* at 10. Oscar alternatively points to a different injury—the high cost of replacing flat RFTs. Notwithstanding that Judge Holwell previously found that Oscar's claims as to this injury did not meet Rule 23's predominance requirement, Oscar claims that Judge Holwell erred, because Oscar need not establish the cause of the flat tire, only that BMW failed to warn the buyer as to its high replacement costs. *Id.* at 11–12.

In opposition, BMW argues, first, that a class of some vehicle consumers who suffered flat tires is not ascertainable, because considerable effort, including individual inquiries, would be required to identify class members. BMW Br. 3–4. Second, BMW contends that by defining the class as those who purchased or leased their MINIs in New York, Oscar includes many owners who are not citizens or residents of New York, giving rise to the need to conduct a choice of law analysis as to each class member to determine whether N.Y. Gen. Bus. L. §§ 349–50 (or some other state's law) would apply to BMW's alleged omission. *Id.* at 5–7. Third, BMW claims that, under §§ 349–50, Oscar must prove that BMW's alleged omission caused each class member to pay more for the MINI than he or she otherwise would have, which requires member-specific facts to determine. *Id.* at 7–12. Fourth, BMW asserts that Oscar's injury theories are based on unfounded premises, such as that the replacement cost of an RFT is necessarily more

expensive, by a determinate amount, than that of other tires. *Id.* at 12–14. Finally, BMW argues that Oscar's claim of numerosity is speculative and insubstantial. *Id.* at 14–15.

In his reply brief, Oscar withdrew his motion insofar as it sought certification under § 350. Oscar Reply 7 n.3. Oscar defends his showing as to numerosity, and argues that the membership in the class (*i.e.*, those who have suffered flat tires) is ascertainable. *Id.* at 2–3. Oscar further contends that, whatever the citizenship of the class members or the location of their tire failure, New York's interest in having cars sold only with proper disclosure necessarily trumps, in a choice of law analysis, any conceivable interest of the state whose citizen suffered injury. *Id.* at 3–5. Oscar also asserts that he need show only common causation of injury, and downplays any variance in the purchase price paid by class members as relevant only to the extent of damages. *Id.* at 5–9.

For the reasons discussed below, the Court holds that Oscar has not satisfied Rule 23(b)(3)'s predominance requirement. There is, therefore, no occasion to reach BMW's alternative argument that Oscar has not shown numerosity.

### III.  Applicable Legal Standards

Under Rule 23(a), to obtain class certification, a plaintiff must demonstrate that (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a); *Teamsters Local 445 Freight Div. v. Bombardier*, 546 F.3d 196, 201–02 (2d Cir. 2008). In addition, the plaintiff must satisfy Rule 23(b). Oscar claims to satisfy Rule 23(b)(3), which requires that (1) questions of law or fact common to the members of the class predominate over individualized questions; and (2) a class

action be superior to other available methods for fairly and efficiently adjudicating the controversy.  Fed. R. Civ. P. 23(b)(3); *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010). Oscar bears the burden of showing each element by a preponderance of the evidence.  *Teamsters Local*, 546 F.3d at 202.

The central command of Rule 23(b)(3) is that "questions of law or fact common to class members predominate over any questions affecting only individual members."  In considering the predominance requirement, the Court first examines the elements of the underlying cause of action asserted on behalf of the putative class.  *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184–87 (2011) ("Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action."). To satisfy Rule 23(b)(3), a plaintiff must show that "those issues in the proposed action that are subject to generalized proof outweigh those issues that are subject to individualized proof." *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 226 (2d Cir. 2006); *see also Millowitz v. Citigroup Global Mkts., Inc. (In re Salomon Analyst Metromedia Litig.)*, 544 F.3d 474, 480 (2d Cir. 2008).

IV. **Analysis**

    A. **N.Y. Gen. Bus. L. § 349**

A private plaintiff suing under § 349 "must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading, and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice."  *City of New York v. Smokes-Spirits.com, Inc.*, 12 N.Y.3d 616, 621 (2009).  Although § 349 "does not require proof of justifiable reliance, a plaintiff seeking compensatory damages must show that the defendant engaged in a material deceptive act or practice that *caused* actual, although not necessarily pecuniary, harm."  *Oswego*

*Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 26 (1995) (emphasis added); *see also Ovitz v. Bloomberg L.P.*, No. 38, 2012 N.Y. LEXIS 549, at *8 (N.Y. Mar. 27, 2012) (slip op.) (under § 349, "a prima facie showing requires allegations that a 'defendant is engaging in an act or practice that is deceptive or misleading in a material way and that *plaintiff has been injured by reason thereof*'") (emphasis in original) (additional citation omitted); *Morrissey v. Nextel Partners, Inc.*, 72 A.D.3d 209, 213 (3d Dep't 2010) ("Although reliance is not an element, plaintiffs must show that the 'material deceptive act' caused the injury.")

      **B.**    **Oscar's Inability to Satisfy the Predominance Requirement as to the Injury Caused by the Alleged § 349 Violations**

For the reasons that follow, the Court's judgment is that the individual inquiries required to determine whether BMW's allegedly deceptive acts or omissions "caused actual . . . harm" to any particular class member predominate over those elements that may be established by common proof. This is so as to both theories of injury Oscar articulates. The first is a purchase price injury: Oscar alleges that class members would have paid less for their MINIs had they been aware (1) of RFTs' increased risk of failure; (2) of the lack of a spare tire; (3) that RFTs cannot be repaired; (4) that RFTs cost more than normal tires to replace; and (5) that replacing RFTs is more inconvenient and time-consuming than replacing normal tires. Oscar Br. 10. The second injury is the incremental cost to replace RFTs, above the replacement cost of normal tires. *Id.* at 11–12.

          **1.**    **Purchase price injury**

Oscar asserts that if consumers had been notified of the various shortcomings of RFTs before buying their MINIs, they would have paid less for the cars. To illustrate this claim, Oscar posits that the suggested retail price of a MINI S in 2006, which came equipped with RFTs, was

$20,600, whereas the suggested retail price of a regular MINI Cooper, without RFTs, was $18,000. It follows from this, Oscar submits, that the presence or absence of RFTs may be fairly assumed to account for the $2,600 price difference. Oscar Br. 11. Oscar's thesis of a purchase price injury common to the class based on alleged undisclosed defects in RFTs does not withstand close analysis.

First, as BMW explains, the presence or absence of RFTs was not the only—or indeed the primary—difference between the regular MINI Cooper and the MINI S for the 2006 model year. BMW Br. 12–13. Instead, the MINI S came equipped with significant standard equipment lacking in the regular MINI. This included a more powerful engine, a 6-speed transmission, traction control, an upgraded suspension system, sport seats, chrome-plated exhaust pipes, a rear spoiler, and stainless steel pedals. *See* BMW Br. 13; Dalton Supp. Decl. ¶ 3 (Dkt. 97).

It is impossible to determine, on a global basis, whether the presence of RFTs, as opposed to the other standard equipment differentiating the MINI S from the MINI Cooper "caused" consumers to pay a higher sum for the MINI S. For some consumers, the RFTs may have been an important factor; for others, not at all; for others, somewhere in between; and others, perhaps most others, may never have thought to isolate the relative contribution of each of the differences between these models in deciding to purchase the MINI S. There are, simply, too many confounding factors to permit a factfinder to make that determination on a class-wide basis. *Cf. City of New York v. Smokes-Spirits.com, Inc.*, 541 F.3d 425, 455 (2d Cir. 2008), *rev'd on other grounds by Hemi Grp., LLC v. City of New York*, 130 S. Ct. 983 (2010) (affirming dismissal of § 349 claim where omitted information was "not, on its own, likely to mislead or assume significance in the deliberation of a reasonable consumer acting reasonably under the circumstances").

Second, it is impossible to conclude, on a global basis, whether the disclosure of the downsides of RFTs would have affected purchasers' decisions to buy the MINI S, or the price at which they would have made that purchase. This is so for two independent reasons: (1) the inherently individualized nature of the purchase decision, and (2) the conjectural nature of the *post hoc* inquiry into how a consumer's purchase decision might have been affected. In so holding, the Court does not find that no reasonable consumer would have found the undisclosed deficiencies of RFTs, as identified by Oscar, germane. But there are simply too many other variables in play to permit that conclusion as to the entire class of consumers; and Oscar supplies no viable reason to regard each consumer's assessment of the importance of this single variable as other than personal.

Further, even among consumers for whom the RFT drawbacks might have been relevant, there is no basis to assume that non-disclosure of these drawbacks would have resulted in a purchase price injury. For example, a potential MINI purchaser might have valued the more powerful engine and 6-speed transmission of a MINI S at $5,000 more than the $18,000 price for a basic MINI but, if alerted to the potential drawbacks of RFTs, might have discounted the value of the MINI S by the $2,400 he or she expected to pay in additional RFT expenses, thereby arriving at the same $20,600 suggested list price for the MINI S. Further, as to any individual consumer, other factors not relating to the intrinsic value of the car and its equipment (*e.g.*, relating to the process by which the price was negotiated with the dealer) might have resulted in (or affected) the purchase price. This further complicates the process of isolating any purchase price injury attributable to the nondisclosure of problems with the RFTs, let alone reliably extrapolating from the experience of one plaintiff (Oscar) to find a common injury to all class members.

This case is thus akin to those in which class certification of claims under § 349 has been denied, on the grounds that confounding factors made it impossible to reliably or practicably find causation on a classwide basis. For example, in *Pelman v. McDonald's Corp.*, 272 F.R.D. 82, 92–95 (S.D.N.Y. 2010), plaintiffs moved to certify a class of McDonald's food purchasers on whose behalf the plaintiffs claimed injuries, including adverse health effects, from McDonald's food. Plaintiffs attributed these injuries to McDonald's allegedly misleading marketing campaign, which had led plaintiffs to believe that the food was healthier than it, in fact, was. 272 F.R.D. at 92. In finding under Rule 23(b)(3) that common issues did not predominate, the court noted that a multitude of factors may contribute to adverse health outcomes, not merely the food eaten in response to defendant's allegedly misleading disclosures. *Id.* at 94. Thus, it was impossible to assign causation of such injury to the defendant's conduct without evaluating, as to each member of the putative class, whether these exogenous factors were present, and, if so, whether they (as opposed to McDonald's allegedly misleading marketing) had contributed to or caused the class member's injury. *See id.* at 94–95. So too here: The impact, if any, on a MINI customer of the omitted RFT disclosures cannot be determined in a vacuum, but rather, can be assessed only in conjunction with the other factors potentially at play in each purchaser's decision.

Similarly, in *Dungan v. Academy at Ivy Ridge*, 249 F.R.D. 413 (N.D.N.Y. 2008), *aff'd*, 344 F. App'x 645 (2d Cir. 2009), plaintiffs sought certification of, *inter alia*, § 349 claims on behalf of a class of parents who had sent troubled teens to Ivy Ridge. As alleged, Ivy Ridge had falsely represented that it conferred accredited high school diplomas, and that credits earned at the school could be transferred to other institutions. 249 F.R.D. at 418–19. Adopting a report

[9]

and recommendation that the motion be denied, the Northern District of New York (McAvoy, J.) found predominance lacking. It observed:

> The evidence adduced at the Rule 23 hearing, together with the affidavits submitted by the parties, demonstrates that the parents of Ivy Ridge students had many motives for sending their children to Ivy Ridge. Indeed, it appears that in nearly all, if not all, circumstances there were multiple reasons for sending children to Ivy Ridge. These reasons include, but are not limited to, geographic location, cost, available extracurricular activities, educational programming, character development programs, the ability to earn "credits," the ability to obtain a diploma, etc. . . . It seems that no parents sent their children to Ivy Ridge solely because of its ability to issue credits or a diploma, but because of Ivy Ridge's claimed ability to deal with troubled or difficult children . . . . Given the significance of the issues of reliance and causation to Plaintiffs' fraud-based and negligent misrepresentation claims and the fact that this inquiry necessarily is personal to each potential class member, the Court finds that these individualized issues are substantially intertwined with the claims as a whole and predominate over any other common issues.

*Id.* at 416–17. That logic applies with equal force here. Vehicle purchase decisions, and, *a fortiori*, the particular price paid for those vehicles, may be based on a variety of factors. The customer's purchase decision and the negotiated purchase price cannot be assumed to rest entirely, or even partially, on disclosures to the customer about the vehicle's tires.

A comparable inability to untangle the factors causing a consumer decision was decisive in *Schrank v. Citibank (S.D.), N.A. (In re Currency Conversion Fee Antitrust Litigation)*, 230 F.R.D. 303, 310–11 (S.D.N.Y. 2004), *reconsideration granted in part on other grounds at* 2005 U.S. Dist. LEXIS 14866 (S.D.N.Y. 2004), *vacated on other grounds by Ross v. Bank of America, N.A.*, 524 F.3d 217 (2d Cir. 2008). There, this Court (Pauley, J.) denied plaintiffs' motion to certify a class of cardholders suing under, *inter alia*, § 349, over the fees, which Citibank allegedly failed to disclose, charged to cardholders when their currency was converted to facilitate foreign transactions. 230 F.R.D. at 305–06. In denying certification on plaintiffs' § 349 claim, Judge Pauley emphasized that "each plaintiff must prove that Citibank caused his

injury," which entailed analyzing whether "Citibank's disclosure of the conversion fees was inadequate, thus deceiving the cardholder into using his Citibank card for foreign purchases when other more economical options were available." *Id.* at 311. Such an inquiry "include[d] an examination of each cardholder's understanding and whether it was justified." *Id.* Thus, Judge Pauley held, although some issues could be resolved by common proof, "individual questions about causation would overwhelm them." *Id.*

The cases in this circuit on which Oscar relies, in which a class was certified on a § 349 claim, are not to the contrary. In *Jermyn v. Best Buy Stores, L.P.*, 256 F.R.D. 418, 435–36 (S.D.N.Y. 2009), the court certified a class asserting, *inter alia*, § 349 claims against Best Buy. The gravamen of that complaint was that, in conflict with an advertised price-matching program which would have provided discounts to customers in certain circumstances, Best Buy in fact had an undisclosed internal policy of denying those price-matching requests. 256 F.R.D. at 423. There, however, the refusal to match lower prices plainly caused injury to the members of the class as defined. The class in that case was defined as:

> All New York citizens and residents who, from January 10, 2002 until the present, made a purchase at Best Buy and within 30 days (14 days for computers, monitors, notebook computers, printers, camcorders, digital cameras and radar detectors) of the purchase found a lower price from an entity qualifying under Best Buy's price match guarantee on an available product of the same brand and model, provided verification of the lower price to Best Buy and were denied the benefit of Best Buy's price match guarantee.

*Id.* at 423. Given the class definition, the asserted "purchase price" injury—*i.e.*, the margin between the lowest price found and the price paid to Best Buy—was necessarily caused by the conduct in question, that is, the undisclosed practice of refusing honoring valid price-matching requests which otherwise would have saved the class members that precise sum.

[11]

Similarly, in *Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 43–44 (E.D.N.Y. 2008) (Bianco, J.) the complaint asserted that, unbeknownst to its customers, Costco had a policy of backdating the start date of the year-long memberships sold to those customers. 249 F.R.D. at 34. For example, if a customer's prior year-long membership ran out in September 30, 2011, and a new year-long membership was purchased in December 15, 2011, Costco would unilaterally backdate the start of that membership to October 1, 2011—depriving the customer of the October 1, 2012 to December 15, 2012 portion of the membership that the customer had paid for on December 15, 2011. *Id.* In finding the Rule 23 predominance requirement satisfied, the court rejected Costco's argument that no harm was caused to the plaintiffs because, in most cases, they were permitted to shop at Costco with expired memberships in the period between the end of their prior membership and the time of renewal. In so ruling, Judge Bianco observed that:

> [A]s plaintiff points out, the theory of injury and damages is not based upon how many times a person was denied the ability to shop during the expired period, but rather is based on the alleged prospective denial of a full 12-month membership at the time of renewal of their annual membership. In other words, the theory of injury and damages relates to the membership fee itself, rather than denial of shopping on a particular day.

*Id.* at 44 n.4. Thus, in *Dupler*, like in *Jermyn*, the injury suffered by the class was plainly caused by the defendant's challenged conduct. The plaintiff class had paid for membership access to a particular store for a designated period of time, and Costco's undisclosed policy of shortening that time period necessarily deprived those customers of a readily determined portion of that value.

Here, by contrast, MINIs have a number of characteristics which customers might value, and to differing degrees. They are fuel efficient; their exterior appearance is easier to customize than that of many other cars—effects may be added such as checkered, mirrored, or flag-painted side-view mirrors, hood stripes, or a roof painted as an American, British, or Scottish flag; and,

[12]

perhaps most valued in New York City, they are, as the name suggests, small, and easily fit into tight city parking spaces. Given these characteristics, there is simply no way—without inquiring on a customer-by-customer basis—to determine whether the non-disclosure of the characteristics of RFTs affected the purchase price paid for the MINIs bought by the putative class members. The Court, therefore, holds that Oscar has not satisfied the predominance requirement of Rule 23(b)(3) with respect to his claim of purchase price injury.

### 2. Tire replacement cost

Oscar alternatively claims injury based on the additional cost (above that for replacing normal tires) of replacing RFTs fitted on the MINI S. Illustrating this injury, Oscar has alleged that he was charged $350 for a replacement RFT by a MINI dealer, but later replaced this tire with a non-RFT tire at a cost of $200.[2]

This theory of injury is, however, flawed for several reasons. First, this theory is at root nothing more than a shorthand means of monetizing the injury that Oscar claims occurred at the moment of purchase. Oscar has previously claimed: (1) purchase causation injury—that customers would not have chosen MINIs with RFTs if BMW had disclosed their relative shortcomings, in other words, that this nondisclosure caused the purchase of the MINI S, which comes equipped with RFTs; and, as already discussed in this opinion, (2) purchase price injury—that consumers would have paid less for their MINIs had they been fully informed. However, the Court has previously rejected class certification on both of these theories. Judge Holwell rejected the first theory in his 2011 decision; and this Court has today rejected the second.

---

[2] In fact, as BMW notes, the record reflects that Oscar paid a variety of prices for replacement RFTs. BMW Br. 13. It is, thus, incorrect to assume that every purchaser whose RFT tires were replaced suffered an identical injury.

Oscar's submissions in support of this motion essentially concede that, regardless of the time the specific tire damage occurs and what brought it about, the monetary injury was ultimately traceable to BMW's nondisclosure at the moment of purchase.  In arguing in support of his claim of common injury based on RFT replacement cost, Oscar asserts that:

> The cause of the flat with regard to Plaintiff's disclosure claims is irrelevant. What is relevant is whether the omissions were significant; if they were then the class members are entitled to the damages that disclosure would have alerted them to and would have allowed them to avoid.  *There are many reasonable alternatives to buying a car with run-flat tires.  But once those tires are bought, the buyer is stuck.*

Oscar Br. 12 (emphasis added).  Oscar's reply brief confirms that his RFT replacement cost theory is simply a new means of measuring damage based on his rejected theories of injury at the time of purchase.  In defending his damage theories against BMW's arguments, Oscar states that:

> What Plaintiff offers is a method to establish a reasonable measure of damages. We submit that it is reasonable to infer that if a potential purchaser had been told that the tires on his MINI S failed at [a higher-than-average rate] . . . *he would have sought cars without those tires or paid less than he did for the cars with the tires.*

Oscar Reply 9 (emphasis added).

Oscar's replacement cost theory thus fails for the same reasons as his purchase-price theory fails.  It assumes a conclusion, that every fully informed customer would have paid a lower purchase price for the MINI S (measured by the amount of the tire replacement cost) than he or she actually did, or would not have purchased the MINI S at all.  The Court, however, has rejected that claim as unsuitable for resolution on a class basis, and the same reasons for that rejection apply to the replacement cost theory.

Furthermore, Oscar's replacement-cost theory has the additional defect of rendering all intervening events irrelevant.  In effect, under his theory, a purchaser of a MINI S whose RFTs required replacement is necessarily entitled to recover the replacement cost differential,

[14]

regardless of an intervening acts or omissions of the purchaser, or BMW, or anyone else, between those dates.[3]

Further, to the extent that Oscar suggests that the failure to disclose RFT replacement cost is alleged to have *caused* the purchase of the MINI S vehicles equipped with those tires—*i.e.*, that consumers provided with full disclosure wouldn't have bought the MINI S with RFTs at all—that injury is not cognizable under § 349 and cannot be the basis for class certification, for two reasons.

First, Judge Holwell rejected, *see* 274 F.R.D. at 512, and Oscar has now abandoned, the claim of injury premised on the notion that BMW's nondisclosure regarding RFTs caused him to purchase a MINI S equipped with those tires. *See* Oscar Br. 9 ("Plaintiff does not quarrel with the denial [of class certification] as to the first form of injury [*i.e.*, that Oscar "would not have purchased his MINI if he had known" about the risks of RFTs].)"

Second, that theory of injury is foreclosed by New York law. The New York Court of Appeals has rejected as "legally flawed" the argument that "consumers who buy a product that they would not have purchased, absent a manufacturer's deceptive commercial practices, have suffered an injury under General Business Law § 349." *Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43, 56 (1999); *see also Baron v. Pfizer, Inc.*, 42 A.D.3d 627, 629 (3d Dep't 2007); *Rice v. Penguin Putnam, Inc.*, 289 A.D.2d 318, 319 (2d Dep't 2001); *Gomez-Jimenez v. New York Law School*, No. 652226/11, 2012 N.Y. Misc. LEXIS 1225, at *32 n.9 (Sup. Ct. N.Y. Cnty. Mar. 21, 2012). Accordingly, Oscar's RFT replacement cost damage theory is either insusceptible of

---

[3] There is, of course, a potentially quite important intervening event—the flat tire. However, as Judge Holwell held, linking BMW's allegedly-deficient disclosure to individual instances of tire damage would destroy predominance and thus present an insurmountable obstacle to class certification. *See* 274 F.R.D. at 513. Oscar is, in effect, attempting to sidestep this fatal problem by recharacterizing the RFT replacement cost as a proxy for the price differential that a properly informed purchaser would have paid.

substantiation by common proof, or is not cognizable under § 349 pursuant to controlling New York case law.

Because the Court has determined that Oscar has failed to satisfy Rule 23(b)(3)'s predominance requirement, it need not address the remaining requirements for class certification under Rule 23. *See In re Grand Theft Auto Video Game Consumer Litig.*, 251 F.R.D. 139, 161 n.26 (S.D.N.Y. 2008); *In re Canon Cameras Litig.*, 237 F.R.D. 357, 359 (S.D.N.Y. 2006).

## CONCLUSION

For the foregoing reasons, Oscar's renewed motion for class certification is denied. The Clerk of Court is directed to terminate the motion at docket number 93.

At the January 27, 2012 pretrial conference, the Court had been prepared to set a summary judgment briefing schedule as to Oscar's individual claim. The need to do so was mooted by Oscar's statement that he wished to move, again, for class certification. Because class certification has again been denied, it is time for Oscar's individual claim to be resolved. The parties are directed to meet and confer and submit to the Court a letter, within 10 days of the date of this Order, stating: (1) whether Oscar intends to pursue his individual claim, and, if so, whether BMW still wishes to move for summary judgment; and (2) if so, proposing a schedule for the expeditious briefing of that motion.

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: June 19, 2012
New York, New York